1
2
3
4                    UNITED STATES DISTRICT COURT
5                       DISTRICT OF NEVADA
6   DARREN A. LUNFORD,                    3:13-cv-00404-RCJ-WGC
7                           Plaintiff,    **REPORT & RECOMMENDATION OF**
                                          **U.S. MAGISTRATE JUDGE**
8          v.
9   ROBERT BANNISTER, et. al.
10                         Defendants.
11
12         This Report and Recommendation is made to the Honorable Robert C. Jones, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15   Defendants' Motion for Summary Judgment. (ECF No. # 31.)[1] As will be discussed below,

16   Plaintiff did not oppose the motion.

17         After a thorough review, the court recommends that Defendants' motion be granted.

18                              **I. BACKGROUND**

19         Plaintiff, a pro se litigant, is a prisoner in the custody of the Nevada Department of

20   Corrections (NDOC), and brings this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF

21   No. 9.) The events giving rise to this action took place while Plaintiff was housed at Northern

22   Nevada Correctional Center (NNCC) and High Desert State Prison (HDSP). (*Id.*) Defendants are

23   Dr. Lee, Dr. Masters, and Dr. Bannister. (*See* Screening Order, ECF No. 8.)

24         On screening, Plaintiff was allowed to proceed with a single claim in Count I that his

25   Fourteenth Amendment rights under the Due Process Clause were violated by defendants

26   Dr. Lee, Dr. Masters, Dr. Centric and Dr. Bannister, based on allegations that he was forcibly

27   administered psychotropic medications without being afforded the opportunity to appear before a

28   _____

          [1] Refers to court's Electronic Case Filing number.

1   forced medication panel. (*See id.*) Dr. Centric was subsequently dismissed without prejudice for

2   failure to timely serve him pursuant to Federal Rule of Civil Procedure 4(m). (*See* ECF No. 29.)

3       Specifically, Plaintiff alleges that when he was transferred to NNCC sometime around

4   December 2008, he was told by Dr. Centric that he was delusional and that he would be

5   prescribed psychotropic drugs. (ECF No. 9 at 7.) Plaintiff told Dr. Centric he was not mentally ill

6   and that he had lost nearly fifty pounds because ESP staff had been starving him. (*Id.*) The

7   following day, Plaintiff refused to take his medication at pill call. (*Id.*) The nurse warned him

8   that the medication would be administered by force by injection if he refused. (*Id.*) He refused

9   and the nurse, with the help of several correctional officers, administered the medication by

10  injection. (*Id.* at 7-8.) Plaintiff later agreed to take the medication orally because he did not want

11  to be subjected to injections. (*Id.* at 8.) He avers that the drugs made him experience a "living

12  rigor mortis" where all his limbs became stiff and he was nearly immobile. (*Id.*) He begged

13   Dr. Centric to take him off the medication but Dr. Centric refused. (*Id.*)

14      In March 2009, Plaintiff transferred to HDSP, and asked the psychiatrist there to take him

15  off of the drugs, but the psychiatrist told him that his mental health records stated he was a

16  delusional psychotic who had nearly starved himself to death. (*Id.*) He was switched to another

17  drug, but Plaintiff continued to suffer adverse side effects. (*Id.* at 9.)

18      In October 2009, Plaintiff transferred to NNCC. In February 2011, he transferred back to

19  HDSP. (*Id.*) In July 2011, he was "so overwhelmed by the adverse side-effects of his medication

20  that he stopped taking the drugs." (*Id.*) In July 2011, Plaintiff saw Dr. Grant Lee who said

21  Plaintiff was psychotic and that he was going to stabilize Plaintiff. (*Id.* at 10.) Plaintiff avers that

22  Dr. Lee prescribed him dangerously high amounts of drug injections. (*Id.*) In August 2011,

23  Plaintiff transferred to the mental health unit at HDSP where Dr. Masters told him he was a

24  paranoid schizophrenic in dire need of anti-psychotics. (*Id.*) In October 2011, he begged

25  Dr. Masters to stop forcing him to take the drugs. (*Id.*) Dr. Masters agreed to take Plaintiff off

26  injections if he agreed to take the drugs orally in higher doses. (*Id.*) Dr. Masters prescribed

27  Plaintiff pills in what Plaintiff describes as dangerously high amounts. (*Id.*) In June 2012,

28  Plaintiff was "expelled" from the mental health unit to general population. (*Id.*)

1    Plaintiff alleges that he has never been brought before a forced medication panel to

2    determine if he has a legal right to refuse treatment. (*Id*. at 11.) He avers that his current treating

3    psychiatrist, Dr. Frye, believes he is not schizophrenic and does not need psychotropic drugs. (*Id*.

4    at 12.)

5    Defendants originally filed their motion for summary judgment on February 6, 2015,

6    arguing Plaintiff's claims are barred by the statute of limitations, and he was afforded an

7    opportunity to appear before a forced medication panel before being forcibly medicated.

8    (ECF No. 31.) Plaintiff did not file a change of address reflecting his transfer to NNCC, and the

9    court surmised Plaintiff was not served with the motion. (*See* ECF No. 40.) Therefore, the court

10   administratively re-filed the motion for summary judgment as of June 19, 2015, and Plaintiff was

11   electronically served with the motion and accompanying exhibits at NNCC. (*Id*.) He was given

12   until July 13, 2015 to file a response. (*Id*.)

13   Plaintiff has filed various documents with the court which he labeled Exhibits C, D and E

14   (ECF Nos. 36, 37, 38), but has not otherwise filed a response to Defendants' motion. The

15   exhibits do not state that they pertain to any particular motion. The first of the filings, identified

16   by Plaintiff as Exhibit C, contains a copy of the screening order entered in another case, 3:13-cv-

17   00308-MMD-VPC. (ECF No. 36.) The second of the filings, identified by Plaintiff as Exhibit D,

18   contains a document with a title, "2013 NV Proficiency Test." (ECF No. 37.) The final filing,

19   identified by Plaintiff as Exhibit E, contains an "Informational Bulletin Newsletter" from the

20   summer of 2013 from an organization identified as "NV-CURE" (Citizens United for the

21   Rehabilitation of Errants) with an address in Las Vegas. (ECF No. 38.) The newsletter mentions

22   that NDOC's director met with NV-CURE's president on April 9, 2013, to discuss various issues

23   of concern pertaining to prison systems. (*Id*.) The court cannot discern any relationship between

24   these documents and the instant action so as to possibly construe them as a response to

25   Defendants' motion. Instead, the court concludes that Plaintiff has failed to respond to the

26   motion for summary judgment.

27   The court cannot grant summary judgment in favor of Defendants simply because

28   Plaintiff failed to file a response; however, Federal Rule of Civil Procedure 56 authorizes the

- 3 -

court to consider the facts not responded to as undisputed. *See Heinemann v. Satterberg*, 731

F.3d 914, 916-17 (9th Cir. 2013) (citing Fed. R. Civ. P. 56 Advisory Committee Notes (2010)).

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no

dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary:

(1) determining whether a fact is material; (2) determining whether there is a genuine dispute as

to a material fact; and (3) considering the evidence in light of the appropriate standard of proof.

*See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary

judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing

the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

*Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party

failed to make a showing sufficient to establish an element essential to that party's case on which

that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-

25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to

establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of

material fact, the opposing party need not establish a genuine dispute of material fact

conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a

jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,*

*Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and

citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot

avoid summary judgment by relying solely on conclusory allegations that are unsupported by

factual data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

1    That being said,

2    [i]f a party fails to properly support an assertion of fact or fails to properly address
3    another party's assertion of fact as required by Rule 56(c), the court may: (1) give
     an opportunity to properly support or address the fact; (2) consider the fact
4    undisputed for purposes of the motion; (3) grant summary judgment if the motion
     and supporting materials—including the facts considered undisputed—show that
5    the movant is entitled to it; or (4) issue any other appropriate order.

6    Fed. R. Civ. P. 56(e).

7           At summary judgment, the court's function is not to weigh the evidence and determine

8    the truth but to determine whether there is a genuine dispute of material fact for trial. *See*

9    *Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all

10   justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

11   merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

12   50 (citations omitted).

13                              **III. DISCUSSION**

14   **A. Due Process Rights**

15          Inmates possess "a significant liberty interest in avoiding the unwanted administration of

16   antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v.*

17   *Harper*, 494 U.S. 210, 221 (1990) (citing *Vitek v. Jones*, 445 U.S. 480, 491-94 (1980);

18   *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *Parham v. J.R.*, 442 U.S. 584, 600-01 (1979)).

19   Nevertheless, "given the requirements of the prison environment, the Due Process Clause

20   permits the State to treat a prison inmate who has a serious mental illness with antipsychotic

21   drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the

22   inmate's medical interest." *Id*. at 227. The Supreme Court outlined "procedural protections ...

23   necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary

24   nor erroneous." *Id*. at 228. The decision to medicate an inmate against his will satisfies due

25   process when facilitated by an administrative review by medical personnel not then involved in

26   the inmate's treatment. *Id*. at 233. Due process does not require a judicial hearing before an

27   inmate may be involuntarily medicated. *Id*. at 228. Nor does it require a hearing conducted in

28   accordance with the rules of evidence or a "clear, cogent, and convincing" standard of proof. *Id*.

at 235. Instead, due process is satisfied if the inmate is provided with notice, the right to be present at an adversarial hearing, and the right to present and cross-examine witnesses. *Id.* at 235. The appointment of counsel is not required. *Id.* at 236.

**B. NDOC Policy Re: Involuntary Administration of Psychotropic Medication**

NDOC's policy regarding psychotropic medications for mentally ill inmates and the involuntary use of such medications is set forth in Administrative Regulation (AR) 643, and more specifically in AR 643.04, 643.05, and 643.06. (ECF No. 31-2 at 4-5.) Within NDOC, psychotropic medications are prescribed and monitored by a practitioner "only in those situations generally accepted in the medical psychiatric community to be responsive to treatment with that particular medication, and only following a physical examination and diagnosis of the inmate by the prescribing medical provider." (ECF No. 31-2 at 4, AR 643.04.)

If an inmate refuses a prescribed psychotropic medication, "the practitioner must then determine whether or not the medication should be prescribed on an involuntary basis." (ECF No. 31-2 at 5, AR 643.05.) "If, after a discussion with the inmate the inmate still refuses the medication and the practitioner determines the medication is a necessary part of the inmate's treatment plan and would prevent deterioration, the practitioner may ask for independent review of the decision to medicate or continue medication by the Medical Review Panel." (*Id.*) Pending such review, the medication will not be administered involuntarily, except in the case of an emergency requiring immediate action to prevent serious harm to the inmate or others. (*Id.*)

The forced medication panel consists of the warden, a psychiatrist and a psychologist not currently involved in the inmate's care. (*Id.*, AR 643.06.) Inmates are to receive twenty-four hours advance notice of review and of the right to participate. (*Id.*) The inmate will be present before the panel unless he refuses, and is given the opportunity to state his reasons for refusing the prescribed medication. (ECF No. 31-3 at 3, Decl. of Terri Jacobs ¶ 11.)[2] The panel considers testimony of the inmate, the inmate's treating physician, the medical report and all other relevant information. (*Id.* ¶ 13.) The panel determines whether to uphold or deny the inmate's right to

---

[2] Terri Jacobs is the Director of Nursing II at NNCC, who supervises the nursing staff in the mental health unit at the Regional Medical Facility (RMF) at NNCC. (ECF No. 31-1 at 2 ¶ 3.)

1    refuse the medication. (No. 31-2 at 5, AR 643.06.) The panel is to review the involuntary

2    medication decision every 180 days. (*Id*., AR 643.05.)

3    **C. Summary of Medical Evidence**

4            The court has reviewed all of the medical evidence submitted by Defendants and it is

5    clear that Plaintiff received extensive treatment from NDOC's mental health professionals during

6    the time period at issue. (ECF No. 32-1.) In October 2008, Plaintiff told NDOC staff that

7    someone was trying to kill him, and that he had to get out of his cell because it was on fire.

8    (ECF No. 32-11 at 5.) In December 2008, he began refusing meals and stated that the prison was

9    "conspiring against him because he is the 'Chosen One.'" (*Id*. at 6.) He was admitted to the

10   infirmary for mental health evaluation. (*Id*.) In January 2009, he told a nurse that an "entity" was

11   living inside him that would kill him if he fed it. (*Id*. at 7.) He was admitted for  mental health

12   evaluation. (*Id*. at 8.) He continued with this claim regarding the "entity" throughout the month.

13   (*Id*. at 8-10.) He refused his medications, and was referred to the forced medication panel, where

14   he appeared on January 30, 2009. (*Id*. at 4, 10.) His right to refuse psychotropic medications was

15   denied at that time. (*Id*. at 3.) In September 2009, he tried to refuse his forced medications.

16   (ECF No. 32-10 at 4-5.) After he was transferred to NNCC in October 2009, however, he was

17   compliant and stable. (*Id*. at 6.)

18           He was evaluated by the forced medication panel again on February 19, 2010.

19   (ECF No. 32-10 at 2-8.) He acknowledged he had a mental illness and that the medications

20   helped him. (ECF No. 32-9 at 5.) Due to his history of refusing medications, the panel voted to

21   deny his right to refuse psychiatric medications at that time. (*Id*.) In May 2010, he was stable,

22   and the Celexa he was on was to be tapered and then discontinued due to his complaints that it

23   interfered with his ability to sleep. (ECF No. 32-9 at 6.) On June 18, 2010, he reported that his

24   prescriptions were helpful, but asked to change the time he took Risperdal and this was

25   accommodated. (*Id*. at 7.) In July 2010, he reported he was doing "fine" on his medications. (*Id*.)

26           Plaintiff was evaluated by the forced medication panel again on August 27, 2010.

27   (ECF No. 32-9 at 2-7.) The panel determined he should continue on the medication regiment as

28   his delusional and odd beliefs seemed to be controlled on the medication. (ECF No. 32-9 at 2-7.)

1    Plaintiff was reviewed by the forced medication panel again on February 9, 2011.

2    (ECF No. 32-8 at 2-3.) At this point, the panel allowed Plaintiff the right to refuse psychotropic

3    medication, *i.e.*, he could stop taking it if he wanted. *Id.*

4    In May 2011, he was taking Risperdal voluntarily. (ECF No. 32-7 at 7.) In July 2011,

5    however, he refused his medications. (*Id.* at 8-11.) He was reviewed by the forced medication

6    panel on July 18, 2011. (ECF No. 32-7 at 11.) He was described as increasingly delusional,

7    disorganized and mentally preoccupied. (*Id.* at 2.) The panel denied Plaintiff's right to refuse

8    psychotropic medication. (*Id.* at 3.)

9    In August 2011, he claimed to be taking his medication, but said he did not want the

10   injections. (ECF No. 32-1 at 147.) During that month he was described as "greatly improved,"

11   "feeling better," and "stabilized." (*Id.* at 143, 146.) He was participating in groups and activities

12   in September 2011, and his Haldol dosage was decreased. (*Id.*) In October 2011 he continued to

13   be calm and stable. (*Id.* at 137.) On December 7, 2011, his prescription was changed to oral

14   Haldol. (*Id.* at 136.)

15   In January and February 2012, he continued to take his oral medications voluntarily. (*Id.*

16   at 133-134.) He complained of side effects from the Haldol in March 2012, and his dosage was

17   reduced. (*Id.* at 132.) It was decreased further in April 2012, and then again on June 13, 2012.

18   (*Id.* at 129, 131.) At the end of the month, he was described as stable. (*Id.* at 127.) He was

19   medication compliant in July 2012. (*Id.* at 126.)

20   Beginning in August 2012 and into September 2012, he began to complain of side effects

21   from the medication. (*Id.* at 124, 126.) In October 2012, he admitted to not taking his medication

22   consistently. (*Id.* at 123.) He was referred to psychiatry regarding his complaints, but agreed to

23   take his medication pending this review. (*Id.*) When he saw the psychiatrist in November 2012,

24   he declined an offer to change his dosage. (*Id.* at 122.) On November 27, 2012, he again said the

25   dosage was "fine the way it is." (*Id.* at 117.) In December 2012, a correctional officer became

26   concerned he was not taking his medications, and on December 12, 2012, he was off all

27   medications. (*Id.* at 120.) He was admitted to the infirmary on December 16, 2012, after telling

28   staff he heard voices telling him to kill. (*Id.* at 115-117.) He said he was having telepathic

communications with others. (*Id*. at 116.) He was diagnosed with a psychotic thought process, schizophrenia and paranoia. (*Id*. at 115.) He was to be transferred to the mental health unit at NNCC to be reviewed by the forced medication panel. (*Id*. at 114.) He continued to refuse his medications. (*Id*. at 106-108.)

On January 2, 2013, he told a staff member that he was an alien and that there was a "presence" in his body. (*Id*. at 100.) He continued with this preoccupation. (*Id*. at 86, 88, 92.) He was reviewed by the forced medication panel on January 18, 2013. (ECF No. 32-6 at 2-3.) He was described as delusional, believing there was an alien life force in his body. (*Id*. at 2.) Nevertheless, the panel determined Plaintiff could refuse to take psychotropic medications if he wanted. (*Id*. at 3.) Following this review, however, Plaintiff refused his medications and became assaultive. (ECF No. 32-1 at 83.) He again referenced his telepathic link, and stated he was Jesus Christ, that he was dying, and that there was a "presence" in him. (*Id*. at 79, 82.) He was assessed as delusional, to the point it could affect his safety and security on the yard, and was admitted for monitoring. (*Id*. at 78.)

He was reviewed by the forced medication panel again on February 8, 2013. (*Id*. at 74; ECF No. 32-5 at 2-3.) His right to refuse psychotropic medication was denied by the panel at this time. (*Id*. at 3.)

In February 2013, he continued to be preoccupied with his delusional beliefs. (*Id*. at 71-73.) By the end of the month, however, he was looking better. (*Id*. at 69.) He reported doing better with Risperdal in March 2013, and was stable and "much improved" in April 2013. (*Id*. at 66-69.) In May 3013, he was "doing well," and in June 2013, his symptoms were adequately controlled. (*Id*. at 64-65.)

Plaintiff was reviewed by the forced medication panel on August 7, 2013. (ECF No. 32-4 at 2-3.) He was described as uncooperative with paranoid delusions. (*Id*. at 2.) It was noted that he would need medication to get remission of psychosis and not be a danger to himself or others. (*Id*.) Nonetheless, at this time, the panel allowed Plaintiff to refuse psychotropic medications. (*Id*. at 3.)

1    In October 2013, he reported he was taking Risperdal and Celexa. (*Id*. at 54.) On

2    November 6, 2013, a mental health counselor indicated he was refusing to take his medications,

3    and he claimed he was "undergoing a drastic transformation and was not of this realm."

4    (ECF No. 32-1 at 53.) He was referred to a psychiatrist for a medication consultation. (*Id*.)

5    In December 2013, he refused his medications, said that the metals in the prison walls

6    were destroying his body, and that others could hear his thoughts. (*Id*. at 51.) He was admitted to

7    the infirmary, and refused his medications. (*Id*. at 50-51.) Later that month, he again referenced

8    his telepathic link, and reiterated his concerns about the metal in the prison. (*Id*. at 47.) He

9    continued to have delusional thoughts and refused his medications. (*Id*. at 45.)

10   He was admitted to the mental health unit for stabilization on January 15, 2014, and

11   continued to refuse medications. (*Id*. at 37, 39.) While there, he told staff he was God and was

12   there to save people, talked to himself, and said he was going to be murdered and was infected

13   by bacteria. (*Id*. at 36.)

14   He was reviewed by the forced medication panel on March 26, 2014. (*Id*. at 23;

15   ECF No. 32-3 at 2-4.) He denied mental illness and refused to take medications, and was

16   convinced he had a serious medical condition from which he was dying. (*Id*.) His right to refuse

17   psychotropic medications was denied, to improve his self-care and delusional thought process.

18   (*Id*.)

19   He continued his delusional thoughts on April 1, 2014, but by April 7, 2014, was

20   "looking much better." (ECF No. 32-1 at 22.) He expressed that he did not want to take the

21   medications, and subsequently reported side effects. (*Id*. at 19-20.) On April 29, 2014, he

22   admitted to feeling better. (*Id*. at 19.) On May 15, 2015, he claimed the medications were making

23   him lethargic, but mental health staff thought he was experiencing the best results they had seen

24   from him for months. (*Id*. at 18.) On June 18, 2014, he indicated he was "doing alright." (*Id*. at

25   10.) He was rational and calm. (*Id*.)

26   He was reviewed by the forced medication panel on September 23, 2014. (*Id*. at 7-8; ECF

27   No. 32-2.) The panel noted that he had stabilized on medications in the past six months, was

28

1   eating and gaining weight, was more rational and was attending group therapy. (ECF No. 32-2 at

2   2.) The panel determined he would continue on forced medication. (*Id.* at 3.)

3       On October 17, 2014, he reported he was feeling "okay." (ECF No. 32-1 at 6.) He was

4   described as improved on October 21, 2014. (*Id.* at 7.) On December 4, 2014, he was medication

5   compliant, and was permitted to attend group therapy. (*Id*. at 2-4.)

6   **D. Analysis**

7       To reiterate, Plaintiff was reviewed by the forced medication panel review on the

8   following dates: January 30, 2009 (denied right to refuse psychotropic medication, *i.e.*, he was

9   required to take it) (ECF No. 32-11 at 2-3); February 19, 2010 (denied right to refuse

10  psychotropic medication) (ECF No. 32-10 at 2); August 27, 2010 (denied right to refuse

11  psychotropic medication) (ECF No. 32-9 at 2-3); February 9, 2011 (allowed him to refuse

12  psychotropic medication) (ECF No. 32-8 at 2-3); July 18, 2011 (denied right to refuse

13  psychotropic medication) (ECF No. 32-7 at 2-3); January 18, 2013 (allowed him to refuse

14  psychotropic medication) (ECF No. 32-6 at 2-3); February 8, 2013 (denied right to refuse

15  psychotropic medication) (ECF No. 32-5 at 2-3); August 7, 2013 (allowed him to refuse

16  psychotropic medication) (ECF No. 32-4 at 2-3); March 26, 2014 (denied right to refuse

17  psychotropic medication) (ECF No. 32-3 at 2-3); and September 23, 2014 (denied right to refuse

18  psychotropic medication) (ECF No. 32-2 at 2-3).

19      According to NDOC records, Plaintiff was present for the reviews by the forced

20  medication panel on the following dates: January 30, 2009; February 19, 2010; August 27, 2010;

21  January 18, 2013; February 8, 2013; August 7, 2013; March 20, 2014; and September 23, 2014.

22  (ECF No. 31-4, Decl. of Annmarie Cutkosky Decl. ¶¶ 6-7.)[3] He was made available to testify

23  and contest the forcible use of medication before each of these panels. (*Id*. ¶ 8.)

24      Defendants' records do not reflect that Plaintiff was present at the panel reviews on

25  February 9, 2011 or July 18, 2011. NNCC's Nursing Director II at NNCC, Terri Jacobs, states in

26  her declaration, however, that an inmate will be present before the panel unless he refuses.

27  _____

28      [3] Ms. Cutkosky is an Administrative Aide II assigned to the Mental Health Unit at NNCC. As part of her
    duties, she attends the medication review panel and takes and maintains the panel minutes.

1    (ECF No. 31-3, Jacobs Decl. ¶ 11.) The court is permitted to take this fact as undisputed since

2    Plaintiff did not oppose the motion and present any evidence to create a genuine dispute as to

3    this material fact. *See Heinemann v. Satterberg*, 731 F.3d 914, 916-17 (9th Cir. 2013) (citing

4    Fed. R. Civ. P. 56 Advisory Committee Notes (2010)).

5         In each of the instances where Plaintiff reviewed by the forced medication panel there is

6    ample evidence to support a finding that he had a serious mental illness, and when the panel

7    determined to forcibly medicate him he was a danger to himself or others and treatment was in

8    his medical interests. In addition, the court takes as undisputed that when he was presented to the

9    panel for review, Plaintiff was able to testify and contest the determination being made by the

10   panel so as to comport with the requirements of the Due Process Clause outlined in

11   *Washington v. Harper*.

12        Therefore, the court recommends that Defendants' motion for summary judgment

13   (ECF No. 31) be granted. As a result, the court need not discuss Defendants' statute of

14   limitations argument.

15                              **IV. RECOMMENDATION**

16        **IT IS HEREBY RECOMMENDED** that the District Court enter an order **GRANTING**

17   Defendants' motion for summary judgment (ECF No. 31).

18        The parties should be aware of the following:

19        1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

20   this Report and Recommendation within fourteen days of receipt. These objections should be

21   titled "Objections to Magistrate Judge's Report and Recommendation" and should be

22   accompanied by points and authorities for consideration by the district judge.

23        2. That this Report and Recommendation is not an appealable order and that any notice of

24   appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

25   until entry of judgment by the district court.

26   DATED:  October 22, 2015.

27                              _____
                               WILLIAM G. COBB
28                             UNITED STATES MAGISTRATE JUDGE

- 13 -